UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH GOLDSTEIN,

*Plaintiff,*

v.

LAWRENCE H. NEWMAN;
KELLY KEATING; AMANDA GOUN;
RACHEL LUTZ; and CARMEN FABIAN,

*Defendants.*

**AMENDED COMPLAINT**

Case No. 25cv4118

JURY TRIAL DEMANDED

## INTRODUCTION

1.    Two prosecutors in the Manhattan District Attorney's Office—Defendants Amanda Goun and her friend Larry Newman—conspired to use the immense powers of their office to prosecute Plaintiff Joseph Goldstein for multiple felonies that they knew never happened.  Such a brazen abuse of process would be hard to believe but for the fact that their conspiracy was caught on tape.  In concocting these false charges against an innocent man, the Defendants not only violated the public trust, but they did so for their own selfish purposes: to help Defendant Goun obtain valuable benefits in her pending divorce case against Mr. Goldstein.

2.    In the summer of 2022, Defendant Goun and Mr. Goldstein commenced divorce proceedings in Manhattan.  Shortly thereafter, Defendant Goun's opportunistic crime spree against Mr. Goldstein began.  On October 5th, Defendant Goun burglarized an apartment belonging to Mr. Goldstein's family in search of evidence that could help her in the divorce case.  Days later, on October 8th, Defendant Goun called 911 to falsely report that Mr. Goldstein had assaulted her with his bedroom door.  Two NYPD officers responded to the scene and thoroughly investigated Defendant Goun's claims.  They questioned her at length.  They carefully reviewed her own video

recording of the incident. The officers' conclusion was unambiguous: Mr. Goldstein had not committed a crime and would not be arrested.

3.      Defendant Goun, however, was fixated on having Mr. Goldstein arrested. And she had the connections to make it happen. Defendant Goun immediately contacted her close "friend" and colleague in the Manhattan District Attorney's office, Defendant Newman, to pressure the NYPD and their own office to pursue false felony charges against Mr. Goldstein. Unbeknownst to Defendant Goun, her corrupt phone call with Defendant Newman was captured on the responding officers' body-worn cameras, which documented this conspiracy happening in real time. Defendants Newman and Goun used their office and influence to have Mr. Goldstein arrested and criminally prosecuted on multiple felony charges despite their knowledge that there was never probable cause for any of them. And Defendants Newman and Goun ultimately pressured two more senior NYPD officers (and a junior prosecutor) to help them with their scheme. But Defendant Goun was not finished concocting false charges. In the days that followed, she manufactured additional false and despicable allegations that Mr. Goldstein had caused three bruises on the forearms of their older son (then 6 years old), which Defendant Newman pursued and then charged as a felony assault.

4.      For the first time in his life, Mr. Goldstein was arrested and faced criminal charges. The prosecutor who prepared and filed the charging document was Defendant Newman. He concealed his misconduct and conflict not only from the arraigning judge, but also from his own superiors in the District Attorney's office. Defendant Goun then quickly implemented her plan to weaponize the false charges in the divorce case. The day after Mr. Goldstein was arraigned on the false charges, Defendant Goun filed an affirmation in the divorce case notifying the court that because of a temporary order of protection that issued after Mr. Goldstein was criminally charged, she had effectively obtained what she had sought in a pending motion in the divorce proceeding: exclusive

use of the marital apartment and sole custody of the couple's two children.  She also sought—and was granted—substantial sums of money in interim support and attorney's fees on the basis of the false charges.  Until her misconduct was revealed, she was granted nearly everything she wanted in the divorce case.

5.      Eight harrowing months later, however, the false charges unraveled as the misconduct and abuse of power came to light.  Defendants Newman's and Goun's office was disqualified from the case.  Neutral prosecutors were assigned who dropped all criminal charges against Mr. Goldstein upon recognizing that they would be "unable to meet their burden of proof at trial" on any of them.  The lead NYPD investigator—Defendant Rachel Lutz—was investigated by the NYPD's Internal Affairs Bureau, which substantiated a finding of an incomplete and improper investigation.  And *every single* neutral observer came to recognize that Defendant Goun had repeatedly lied about Mr. Goldstein's treatment of their children.  The NYC Administration for Children's Services declined to pursue Defendant Goun's allegations of child abuse or neglect and later found her allegations unfounded.  Social workers from Comprehensive Family Services ("CFS") compiled detailed reports that repeatedly and consistently contradicted Defendant Goun's allegations.  The children's *own* attorney (known as an "AFC")—who was appointed to singularly represent the children's interests— concluded that Defendant Goun's reports of Mr. Goldstein's maltreatment of the children are "just not credible."  Finally, a court-appointed forensic psychologist concluded in a 108-page report that there was no basis to believe that Mr. Goldstein had ever physically harmed either of his children.  Given all the exculpatory evidence, the judge presiding over the matrimonial case was shocked that Defendant Goun "refuse[d] to consider the assessments of CFS, the Bronx District Attorney's Office, the AFC, and this Court."

6.      And perhaps most troublingly, many of these independent observers and others also

came to another horrifying conclusion: Defendant Goun had *coached* her young children to make false reports that their father had physically harmed them.  Reports from CFS "reflect how both children . . . have been recruited to do [Defendant Goun's] bidding."  The children's attorney noted that "the children are being, frankly, coached [by Defendant Goun] to make accusations against Mr. Goldstein," that they "are being used in this case," and that Defendant Goun "tells the children what to say to me" in an attempt to "control the narrative coming from the children."  The court-appointed forensic psychologist also concluded that Defendant Goun had coached the children to make false accusations against Mr. Goldstein.  Finally, the NYPD itself ultimately came to realize that "there is coaching that is going on," that Defendant Goun is "malicious[ly] . . .using the children against" Mr. Goldstein, and that Defendant Goun is "utilizing the system for her own benefit."

7.    Although much of Defendant Newman's and Goun's gross misconduct ultimately came to light, by then, significant and lasting damage had been done.  Mr. Goldstein's arrest, confinement, and eight-month-long prosecution caused horrific harm to him and his two children.  Defendants Newman and Goun had also for some time succeeded in achieving their principal goal: using the manufactured felony charges to obtain significant tangible benefits for Defendant Goun in the couple's divorce proceedings.  Mr. Goldstein brings this action to remediate his injuries and protect his children.

## JURISDICTION AND VENUE

8.    This action arises under 42 U.S.C. §§ 1983 and 1988, New York State law, and New York City law.

9.    Jurisdiction over Mr. Goldstein's claims is conferred on this Court by 28 U.S.C. §§ 1331, 1343, and 136.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

4

## PARTIES

11.     **Plaintiff Joseph Goldstein** is a resident of New York, New York, and was at all relevant times married to Defendant Amanda Goun.

12.     **Defendant Lawrence H. Newman** was at all relevant times a personal friend of Defendant Goun and was employed as an Assistant District Attorney at the Manhattan District Attorney's Office until on or about January 10, 2023.  From 2014 until January 10, 2023, Defendant Newman was the Bureau Chief of the Manhattan District Attorney's Office's domestic violence unit. Between January 2023 and February 2025, Defendant Newman was employed as an executive agency counsel at the New York City Police Department, where he coordinated and supported administrative prosecutions of police officers for alleged misconduct.  Since February 2025, Defendant Newman has been employed as special counsel at the Kings County District Attorney's Office.

13.     **Defendant Amanda Goun** was, at all relevant times, married to Mr. Goldstein, a personal friend of Defendant Newman, and employed as an Assistant District Attorney at the Manhattan District Attorney's Office.

14.     **Defendant Kelly Keating** was at all relevant times employed as an Assistant District Attorney at the Manhattan District Attorney's Office.

15.     **Defendant Rachel Lutz** was at all relevant times a detective employed by the New York City Police Department.

16.     **Defendant Carmen Fabian** was at all relevant times an officer employed by the New York City Police Department.

## STATEMENT OF FACTS

I.    **Defendant Goun's Career as an Assistant District Attorney and Longstanding Personal Friendship with Defendant Newman**

17.    In 2011, Defendant Goun joined the New York County District Attorney's Office (also known as the Manhattan District Attorney's Office) ("DANY") as an Assistant District Attorney ("ADA").

18.    At some point between 2011 and 2013, Defendant Goun began working directly under Defendant Newman in the Domestic Violence Unit, where he was a Deputy Bureau Chief.

19.    Defendants Newman and Goun had both worked in Trial Bureau 40.

20.    Defendants Newman and Goun had many friends in common.

21.    Throughout her career, Defendant Newman served as a mentor for Defendant Goun.

22.    Defendants Newman and Goun developed a close personal friendship.

23.    Defendant Goun included Defendant Newman on a draft wedding invitation list.

24.    Defendant Goun had Defendant Newman's personal cell phone number stored on her phone, saved as "Larry Personal Cell."

25.    Defendant Newman specifically referred to Defendant Goun as a "friend" of his.

II.    **Defendant Goun and Mr. Goldstein's Relationship**

26.    Defendant Goun and Mr. Goldstein met in June 2014.

27.    Mr. Goldstein has at all relevant times been employed as a reporter at a news organization headquartered in Manhattan.

28.    From November 2014 until November 2015, Mr. Goldstein mainly worked in Kabul, Afghanistan, while Defendant Goun resided in New York City.

29.    Defendant Goun and Mr. Goldstein were married in August 2015.

30.    In 2016, Defendant Goun and Mr. Goldstein's first child ("Child 1") was born.

31.     In May 2017, Defendant Goun left her job at DANY for part-time work with a more flexible schedule while Child 1 was a toddler.

32.     In 2018, Defendant Goun and Mr. Goldstein's second child ("Child 2") was born.

33.     In December 2018, Defendant Goun began working as a Special ADA in the Suffolk County District Attorney's Office's Conviction Integrity Bureau.

34.     In the spring and summer of 2022, Defendant Goun left the Suffolk County District Attorney's Office and rejoined DANY as an ADA and Deputy Bureau Chief.

### III.    Defendant Goun and Mr. Goldstein's Filing of Competing Divorce Proceedings

35.     By the summer of 2022, the marriage between Defendant Goun and Mr. Goldstein began to break down.

36.     On June 30, 2022, unbeknownst to Mr. Goldstein, Defendant Goun retained matrimonial attorneys.

37.     Throughout the summer of 2022, Defendant Goun devised ways to gain advantage and improve her position ahead of filing for divorce.

38.     For example, Defendant Goun aimed to remove Mr. Goldstein from their shared marital apartment because she believed it would give her an advantage in the divorce proceeding.

39.     Defendant Goun believed that removing Mr. Goldstein from their family home would assist her in obtaining a court order giving her custody of their two children.

40.     Additionally, Defendant Goun and her parents aimed to leverage the possibility of divorce proceedings to obtain significant amounts of money from Mr. Goldstein and his parents.

41.     For example, on August 31, 2022, when Mr. Goldstein's parents e-mailed Defendant Goun's father and stepmother requesting to speak about the well-being of their grandchildren in light of Defendant Goun and Mr. Goldstein's "deteriorating situation," Defendant Goun's father quickly responded by demanding money.

42.    Specifically, he stated: "if you sincerely want this resolved, use the week to prepare a financial settlement that specifically allows [Defendant Goun] and the boys to maintain a standard of living that they have had up to now."

43.    Neither Mr. Goldstein nor his parents acceded to the Gouns' demand to prepare a "financial settlement."

44.    On September 2, 2022, Defendant Goun filed for divorce and served Mr. Goldstein the following week.

45.    Through her divorce petition, Defendant Goun requested, amongst other relief: (i) sole custody of their children; (ii) child support; and (iii) spousal maintenance.

46.    Mr. Goldstein vigorously contested the terms of Defendant Goun's divorce complaint and also filed his own divorce petition.

**IV.    Amidst the Divorce Proceedings, Defendants Newman and Goun (With the Assistance of Defendants Fabian, Lutz, and Keating) Orchestrated, Pursued, and Brought False Felony Assault and Child Endangerment Charges Against Mr. Goldstein**

47.    In October 2022—just weeks after initiating divorce proceedings—Defendant Goun hatched and executed a plan along with Defendant Newman to use the power of their prosecutorial office to pursue false felony criminal charges against Mr. Goldstein.

<u>**Oct. 5-7, 2022 – Defendant Goun's Burglary and Its Aftermath**</u>

48.    On October 5, 2022, to obtain evidence to use against Mr. Goldstein in the divorce proceeding, Defendant Goun used false pretenses to burglarize a Brooklyn apartment owned by the estate of Mr. Goldstein's deceased grandmother (the "Brooklyn Apartment").

49.    Between March 2018 and August 2020, Defendant Goun and Mr. Goldstein had leased the Brooklyn Apartment from Mr. Goldstein's grandmother.

50.    Neither Defendant Goun nor Mr. Goldstein had lived in the Brooklyn Apartment since

8

August 2020.

51.     Mr. Goldstein, however, had certain personal property stored in the Brooklyn Apartment, of which Defendant Goun was aware.

52.     As of October 5, 2022, Defendant Goun did not have a key to the Brooklyn Apartment and knew that she was not permitted to enter it.

53.     Nevertheless, on October 5, 2022, Defendant Goun gained access to the Brooklyn Apartment by falsely telling the building's doorman that she was permitted to enter and wanted to pick up certain of the children's belongings.

54.     The children had no belongings in the apartment, which Defendant Goun knew.

55.     Once Defendant Goun gained entry to the Brooklyn Apartment by way of false pretenses, she stole property that she knew belonged to Mr. Goldstein.

56.     That property included valuable electronic storage devices which contained files that were personal and important to Mr. Goldstein.

57.     While in the Brooklyn Apartment, Defendant Goun did not obtain any property belonging to Mr. Goldstein's children (as there were no such belongings in the Brooklyn Apartment).

58.     While in the Brooklyn Apartment, Defendant Goun also took photographs.

59.     Defendant Goun's conduct amounted to felony burglary, larceny, and trespassing under the New York Penal Code.

60.     Unbeknownst to Defendant Goun, while she was in the Brooklyn Apartment, the building's front desk alerted Mr. Goldstein's parents to the fact that Defendant Goun was in the apartment.

61.     In response, Mr. Goldstein's parents informed the doorman that Defendant Goun was not permitted to enter the Brooklyn Apartment and that she was trespassing.

62.     The doorman then went up to the Brooklyn Apartment, confronted Defendant Goun, and escorted her out.

63.     Shortly after being informed about the trespassing, Mr. Goldstein sent a text message to Defendant Goun, stating: "You need to leave [the Brooklyn Apartment], Amanda. You are trespassing."

64.     Approximately ten minutes later, Mr. Goldstein's father also sent a text message to Defendant Goun, stating: "You trespassed in our apartment.  What did you do in the apartment?"

65.     Defendant Goun did not respond.

66.     The day after her burglary of the Brooklyn Apartment, Defendant Goun submitted evidence to the divorce court that she had obtained during her burglary.

67.     Specifically, on October 6, 2022, Defendant Goun moved for an Order to Show Cause ("OTSC") seeking the following relief: (i) removal of Mr. Goldstein from the marital apartment by way of her knowingly false claim that Mr. Goldstein owned a second apartment (the Brooklyn Apartment); (ii) an order for Mr. Goldstein to pay *her* attorneys' fees in the initial amount of $50,000; (iii) interim support to finance her alleged $497,000-per-year lifestyle; and (iv) primary custody of their children.

68.     Defendant Goun attached to her October 6th OTSC evidence she obtained during her burglary of the Brooklyn Apartment, including photographs from inside the Brooklyn Apartment, in an attempt to show (falsely) that Mr. Goldstein owned and lived at the Brooklyn Apartment and thus had a home to reside in other than the marital apartment.

69.     Further, in the affirmation accompanying her OTSC, Defendant Goun invoked and relied upon her authority as a public officer by emphasizing for the Court that as an ADA in DANY, she "would stake [her] entire personal and professional reputation on the truth and accuracy of the

statements made herein."

70.     On October 7, 2022, Mr. Goldstein's matrimonial attorneys sent Defendant Goun's matrimonial attorneys an e-mail outlining Defendant Goun's criminal conduct with respect to the Brooklyn Apartment.

71.     Especially as a veteran ADA, Defendant Goun knew committing a felony could pose drastic professional and personal consequences for her, including that she could be arrested.

72.     On the other hand, Defendant Goun also knew that it would provide her significant benefits in the divorce proceedings if *Mr. Goldstein* was subjected to criminal charges, especially felonies.

73.     With these two goals in mind (avoiding responsibility for her own criminal conduct and gaining benefits in the divorce proceedings), Defendant Goun devised her plan to have her office—DANY—criminally charge Mr. Goldstein with felonies.

### Oct. 8, 2022 – Defendant Goun Stages a Fake Assault and Conspires with Defendant Newman to Orchestrate False Felony Charges

74.     On October 8, 2022, just days after Mr. Goldstein, Mr. Goldstein's parents, and Mr. Goldstein's lawyers (correctly) accused Defendant Goun of trespassing and other crimes, Defendant Goun proceeded to have Mr. Goldstein arrested on false felony charges (we refer to this incident throughout as the "October 8 Incident").

75.     In the late afternoon of Saturday, October 8, 2022, Defendant Goun and Mr. Goldstein were both in the marital apartment.

76.     At around 4:30 p.m., amidst a charged conversation, Mr. Goldstein told Defendant Goun that her actions three days earlier at the Brooklyn Apartment amounted to "burglary."

77.     Specifically, he stated, "You committed burglary.  I went there today and I'm missing files. . . .  And I need to figure out what to do . . .  do I tell the police?  . . .  I'll have my lawyers

communicate with yours."

78.    Defendant Goun and Mr. Goldstein began to argue in the living room.

79.    Mr. Goldstein then retreated into his separate bedroom to disengage from the escalating argument.

80.    Mr. Goldstein closed his door and called his father.

81.    Defendant Goun sought to restart the argument.

82.    Defendant Goun approached Mr. Goldstein's closed door while video recording with her cell phone as she berated Mr. Goldstein.

83.    Defendant Goun opened the door that Mr. Goldstein had closed.

84.    Mr. Goldstein requested that Defendant Goun "get away from me."

85.    Defendant Goun continued to berate and video-record Mr. Goldstein while he was in his bedroom.

86.    Mr. Goldstein, believing himself to be safely and securely in his own room, approached the bedroom door and closed it for privacy, to avoid any further argument, and to continue speaking with his father.

87.    The door shut unimpeded.

88.    The door did not strike Defendant Goun.

89.    Yet, Defendant Goun took this opportunity to set in motion a false criminal proceeding against Mr. Goldstein that would help her obtain her goals.

90.    At or about 5:00 p.m., Defendant Goun called the NYPD via 911 and falsely claimed that Mr. Goldstein shut the door to his bedroom into her arm.

91.    Defendant Goun falsely claimed that Mr. Goldstein had "just slammed the door on my arm."

92.    In part to deescalate the situation, Mr. Goldstein left the home.

93.    Several NYPD officers responded after Mr. Goldstein had left.

94.    Defendant Goun immediately told the responding officers that she was an ADA.

95.    The responding officers conducted a thorough investigation of the scene.

96.    The responding officers spoke at length with Defendant Goun.

97.    The responding officers closely reviewed the video recording that Defendant Goun had made.

98.    One of the responding officers took a video recording on his own phone of Defendant Goun's phone as she played the video recording.

99.    Defendant Goun told the responding officers that Mr. Goldstein's shutting of the door "just knocked me back" and "it pushed me across the room."

100.    Defendant Goun repeatedly informed the responding officers both verbally and with gestures that the door had hit her on the upper arm, near her shoulder.

101.    The responding officers also asked Defendant Goun: "Has he ever like punched you directly" or "slapped" you?

102.    Defendant Goun answered that Mr. Goldstein had never punched or slapped her: "No," Defendant Goun said, "[t]hat would be like a very clear, obvious thing."

103.    After conducting their investigation, the responding officers informed Defendant Goun that based on their investigation, including their review of the scene and of her video recording, their examination of her arm for marks or redness (there were none), and their lengthy interview of Defendant Goun, Mr. Goldstein had not committed a crime.

104.    In particular, the responding officers informed Defendant Goun that Mr. Goldstein had, if anything, committed the non-arrestable offense of harassment, which is a violation and not a

13

crime.[1]

105.    One responding officer said, "But you're not hurt, you're not injured."

106.    Another responding officer said, "On the video, you can see it . . . His intention was to close the door."

107.    When the responding officers spoke amongst themselves outside of Defendant Goun's presence, one officer described the incident in the following way: "You see it very clearly on the video.  It was nothing."

108.    One responding officer stated that, "she didn't have any visible injuries . . . there is nothing visible."

109.    Upon hearing that the responding officers had determined that there was no probable cause to arrest Mr. Goldstein for a crime, Defendant Goun began to change her story.

110.    Twenty minutes after the responding officers arrived, Defendant Goun for the first time suggested Mr. Goldstein hit her with the door so forcefully that she fell to the ground.

111.    Defendant Goun claimed she "totally forgot" that she actually "went down."

112.    Defendant Goun's newfound story that she "went down" was false, as made clear by, among other things, her own video recording.

113.    Despite this new story, the responding officers remained steadfast that Mr. Goldstein had not committed any arrestable offense.

114.    Defendant Goun then told the responding officers that she wanted an order of protection or some legal process that would exclude Mr. Goldstein from the marital apartment.

115.    The responding officers advised Defendant Goun that, if she wished, she could attempt to secure a temporary order of protection in Family Court (rather than Criminal Court, given

---

[1] For the avoidance of doubt, there was no basis to conclude that Plaintiff had committed even a violation (for harassment or otherwise).

that this was not a criminal issue in their informed assessment).

116.    Defendant Goun repeatedly indicated to the officers, however, that she did not want to seek an order of protection in Family Court.

117.    Rather, Defendant Goun made clear that she instead wanted Mr. Goldstein to be criminally charged so that she could get an automatic order of protection through the criminal process and obtain exclusive occupancy of the apartment (and other benefits).

118.    Rather than accept the determinations of the responding NYPD officers who had thoroughly investigated the matter, Defendant Goun chose to leverage her position of influence and authority as a DANY prosecutor to pursue false criminal felony charges against Mr. Goldstein.

119.    Defendant Goun texted Defendant Newman, a Bureau Chief in DANY and her personal friend, to seek his help getting Mr. Goldstein arrested and arrange with him to pursue multiple felony charges against Mr. Goldstein.

120.    This is even though neither Defendant Newman nor anyone at DANY had reviewed or analyzed any evidence, and even though the NYPD, which had conducted a meaningful investigation, had determined that no crime had occurred.

121.    Defendant Goun sent a text message to Defendant Newman asking whether, "[i]n a DV situation if a person is pushed back by the intimate partner by a door, pushed back, the door shut on her, is that arrestable?"

122.    Defendant Newman responded by text, "Arrestable is a funny term," and that "[a]nything probably is with the right tone of voice."

123.    Defendant Newman then called Defendant Goun.

124.    Defendant Goun's side of this phone conversation is captured on the responding officers' body-worn cameras ("BWCs").

125.    As captured on those BWCs, Defendant Goun stated, among other things and often in response to Defendant Newman's questions:

    a.    "What I'm learning is this is not arrestable, that I have to go to family court with the kids tomorrow."

    b.    "Yeah, we're in the 2-0."[2]

    c.    "Of course it's an attempted assault 2."

    d.    "This is dinky, it's dinky.  I'm not hurt, like my arm hurt, oh, it was a little red.  It's dinky.  But he purposefully came across the room, knocked the door into me, to shut the door, didn't say excuse me, didn't wait for me to leave, he shut the door with me standing there, to put me out of the way, and so I flew back to him."

    e.    "He never actually touches me or leaves a mark on me."

    f.    "This one, no.  Other ones in front of the kids, absolutely in front of the kids.  But this one, no."

    g.    "No, no, no, no, except he has said 'shit' in front of them."[3]

    h.    "Their [the police officers'] feeling is, simply, just that because his intention was just to shut the door – he was just trying to close the door."

126.    The entirety of the conversation between Defendants Newman and Goun was within earshot of the responding officers.

127.    During that conversation, and as reflected on the BWCs, the demeanor of the responding officers changed.

128.    For example, immediately after Defendant Goun said to Defendant Newman, "Of course it's an attempted assault 2," one of the responding officers asked the other, "You want me to call the supervisor?"

---

[2] The "2-0" refers to the 20th Precinct, thus identifying the chain of command for Defendant Newman in front of the officers.

[3] On information and belief, this was in response to Defendant Newman asking Defendant Goun whether Plaintiff had ever harmed the children.

129.    That officer then told Defendant Goun, "ma'am, I'm going to run it through my supervisor."

130.    The responding officers were influenced by the involvement in this investigation of Defendant Newman, a supervisory ADA, and Defendant Goun, an ADA invoking her authority.

131.    Even still, however, the responding officers yet again conveyed that they could only write the incident up as a non-arrestable violation.

132.    On information and belief, one of the supervisors to whom the responding officers "r[a]n it through" was Defendant Fabian, a sergeant who later arrived on scene.

133.    When Defendant Fabian arrived on scene, but before entering the apartment or speaking with Defendant Goun, the responding officers showed her the video recording one of the officers had taken of Defendant Goun's iPhone as it played her video of the staged incident.

134.    After briefly watching that video (which does not show any impact, as there was none), and without speaking to Defendant Goun, Defendant Fabian upgraded the alleged incident to the misdemeanor of assault in the third degree, an arrestable offense, and thus authorized and pursued the arrest and prosecution of Mr. Goldstein.

135.    The video that Defendant Fabian reviewed, however, did not provide probable cause to believe that Mr. Goldstein had committed assault in the third degree (or any crime).

136.    Defendant Fabian thus did not have probable cause to believe that Mr. Goldstein had committed assault in the third degree (or any crime).

137.    Defendant Fabian then entered the apartment.

138.    During the telephone conversation between Defendants Newman and Goun, Defendant Goun eventually asked Defendant Newman: "What should I write down?"

139.    Until then, Defendant Goun had refused the responding officers' request for her to

write down her statement of what had occurred (in what is called a "Domestic Incident Report").

140. For the next two minutes, Defendant Goun listened as Defendant Newman spoke to her in response to her question.

141. On information and belief, Defendant Newman instructed Defendant Goun on what to write down in the Domestic Incident Report and his instructions were specifically intended to make sure Defendant Goun's allegations would support the false felony charges he was planning to bring against Mr. Goldstein.

142. In this way, among others, Defendant Newman inserted himself into the investigation of Mr. Goldstein.

143. Defendant Goun then stated: "Okay, great, thanks."

144. Defendant Goun then wrote down a false report of what had occurred, including, for example, that Mr. Goldstein "slamm[ed] [the] door into me" and "knocked me from the door."

145. As Defendant Goun wrote down what Defendant Newman told her to write, she told the responding officers, "I'm just doing what he told me to do.  From DV."

146. Defendant Goun further told the responding officers, "I called Larry because I used to work for him and now work with him."

147. Defendant Goun further told the responding officers, "Larry told me to put all of it down, for what he's gonna charge later."

148. On information and belief, Defendant Newman had informed Defendant Goun that he would be the one drafting the charging instrument against Mr. Goldstein.

149. After the phone call, Defendant Newman texted Defendant Goun, "I have a question for when they're done."

150. Defendant Goun sent Defendant Newman pictures of the Domestic Incident Report

she had filled out.

151.    On the Domestic Incident Report, next to the question, "Injured?", the responding officers had checked the "no" box.

152.    Defendant Goun texted Defendant Newman, "Thank you and thank you."

153.    In response, Defendant Newman texted Defendant Goun: "Thank you for sending these.  Let's have another rule between us?  No apologies, no more talk about being embarrassed, and no more thanking me.  Ok?  Whether as a friend or a professional, we need to make sure you are safe and work on the rest of whatever too."

154.    Defendant Newman also texted: "You can call email or text anytime.  Always could have.  But let's keep doing that going forward?"

### Oct. 9-12, 2022 – Defendant Goun Aggressively Pushes Defendant Lutz to Pursue False Assault Charges and New Manufactured and False Child Assault Allegations

155.    Beginning on October 9, 2022, Defendant Goun (and Defendant Newman) actively pushed a detective, Defendant Lutz, to investigate and pursue serious yet false criminal charges against Mr. Goldstein.

156.    At 9:00 a.m. on October 9, 2022, the morning after the October 8 Incident, Defendant Goun called the NYPD's 20th Precinct and spoke with Defendant Lutz, requesting information about the case against Mr. Goldstein.

157.    Defendant Goun "stated that she wanted to know if subject was arrested since she made the report."

158.    Defendants Goun and Lutz then agreed for Defendant Goun to come in for an interview.

159.    On information and belief, Defendant Lutz then watched the responding officers' BWC footage, which included a recording of Defendant Goun's video as well as her conversation

19

with Defendant Newman.

160.    At 12:45 p.m., Defendant Lutz interviewed Defendant Goun at the 20th Precinct in Manhattan.

161.    Defendant Goun reported to Defendant Lutz a similar false story she had told to the NYPD officers the day before.

162.    However, her story had now changed again in ways to (falsely) make Mr. Goldstein seem even more culpable and to satisfy the elements of Defendant Newman's proposed charges.

163.    Defendant Goun's statements to Defendant Lutz in this interview were inconsistent with the BWC footage, with Defendant Goun's statements to the responding officers the day before, and with Defendant Goun's written statement in the Domestic Incident Report.

164.    For one, Defendant Goun reported that she now had two bruises on her arm, one near the elbow and one on her forearm.

165.    These bruises, however, were not where Defendant Goun had previously and repeatedly claimed that the door struck her.

166.    As alleged above, Defendant Goun told the responding officers repeatedly that the door struck her on the upper arm near her shoulder, not the forearm or elbow.

167.    Additionally, during the interview with Defendant Lutz, Defendant Goun claimed for the first time that after being hit by the door, she fell against a "coffee table."

168.    As Defendant Lutz's notes of that conversation state: "Door strikes c/v in arm, striking right forearm w/ door, causing c/v to fall striking her arm (Rgt) on coffee table."

169.    But Defendant Goun had not said anything to the responding officers or in her Domestic Incident Report about hitting a coffee table or any other object.

170.    Defendant Goun's statement that she fell against a coffee table was knowingly false.

171.    Indeed, the BWC footage from the responding officers shows that the coffee table was not in a location in which it would have been possible for her to have hit it.

172.    Thus, any review of the BWC footage or Defendant Goun's video recording would have made it clear that Defendant Goun's story that she hit a coffee table was false.

173.    At that interview, Defendant Lutz took photographs of Defendant Goun's alleged injuries.

174.    At that interview, Defendant Goun told Defendant Lutz that she (Defendant Goun) had recorded the October 8 Incident on her cell phone.

175.    On information and belief, Defendant Goun did not provide that video recording to Defendant Lutz and Defendant Lutz failed to obtain it.

176.    On information and belief, at that interview, Defendant Goun pressed Defendant Lutz to pursue not just assault charges but also child endangerment charges, on the theory that her and Mr. Goldstein's children were present in the apartment during the October 8 Incident.

177.    On information and belief, Defendant Lutz responded by telling Defendant Goun that a child endangerment charge would require that the children had witnessed firsthand the supposed assault.

178.    At 1:50 p.m., after the interview concluded, Defendant Lutz activated a Probable Cause iCard for Assault in the 2nd Degree, a felony that carries a two-to-seven-year prison sentence.

179.    At the time she activated the iCard, Defendant Lutz did not have probable cause that Mr. Goldstein had committed a crime.

180.    The iCard did not state anything about child endangerment.

181.    On information and belief, Defendant Goun left her interview with Defendant Lutz concerned that she had not sufficiently implicated her children in the false story that she relayed to

Defendant Lutz.

182.    Defendant Goun knew that involving the children in her allegations against Mr. Goldstein would likely result in an order of protection that would sever Mr. Goldstein's relationship with his children.

183.    Thus, beginning on the morning of October 10, 2022, Defendant Goun attempted to influence Defendant Lutz with new false allegations involving the children that implicated Mr. Goldstein, in two separate ways: (i) that the children witnessed the staged October 8 Incident; and (ii) that Mr. Goldstein had physically hurt Child 1 in an unrelated incident, causing injuries.

184.    The effort to involve the children in these ways began on the morning of October 10, 2022, when Defendant Goun texted Defendant Lutz the following:

> . . . Following up on the endangerment charge—our kid has been talking about what [Mr. Goldstein] did on Saturday, now asking me about it.  So I can't tell you this door slam didn't happen in front of the [children] or in their presence—they at least heard it, saw part of it.

185.    Defendant Goun was "[f]ollowing up" on Defendant Lutz's previous statement that the children would have had to see the October 8 Incident for a child endangerment charge to arise.

186.    Defendant Lutz texted back that she would "call you later today for more info on that."

187.    By 5:28 p.m., Defendant Lutz had not called Defendant Goun, leading Defendant Goun to send another text asking "if we're talking soon?"

188.    Defendant Lutz did not respond for the rest of the day.

189.    Defendant Goun used that evening to craft a plan to drastically escalate her false allegations regarding the children.

190.    Specifically, on the evening of October 10, 2022, Defendant Goun coached Child 1 to falsely state that Mr. Goldstein had physically and recently harmed him.

191.    Starting that evening, Defendant Goun recorded at least three videos on her cell phone

of Child 1 stating that Mr. Goldstein had grabbed Child 1's arms, causing bruising.

192.    Defendant Goun relayed Child 1's manufactured allegations to Defendant Lutz during a lengthy text conversation that the two had beginning October 10, 2022, and into the following day, October 11, 2022.

193.    Before reporting her false allegations that Mr. Goldstein physically harmed Child 1, Defendant Goun reported further false information concerning her false allegation that Mr. Goldstein had struck her with the door during the October 8 Incident.

194.    Specifically, despite earlier referring to the October 8 Incident as "dinky" and stating that she was "not hurt," Defendant Goun now suggested that it was possible that her arm was *fractured* during the October 8 Incident.

195.    Defendant Goun stated as follows:

> I went to dr for the pain, they did x-rays and said bone contusion they can [sic] say for now but so much inflammation inside at injury so they don't know if there is a fracture there, so I'm to get x-rays again in 1 week if still feel it.  They called in Rx pain meds for me—for pain up and down arm from some nerve, and to get that inflammation down.

196.    On information and belief, Defendant Goun's description of what her doctor supposedly did and said was false and purposefully so in order to make Mr. Goldstein appear more culpable to Defendant Lutz.

197.    In fact, Defendant Goun had already had an x-ray taken on October 9 at GoHealth Urgent Care on West 69th Street.

198.    The records of that visit include a doctor's note.

199.    Although that note reflects the fact that Defendant Goun reported to the doctor that she was experiencing swelling and pain and that *she* was supposedly concerned about a possible fracture, the doctor's conclusion after the x-ray was clear that there was no fracture.

200.    Specifically, the doctor concluded: "Impression: No acute fracture or dislocation."

201.    Defendant Lutz, having seen the supposed injuries and knowing Defendant Goun's claims about her injuries were false (or, at the very least, believing that they were wildly exaggerated), did not respond to the substance of any of the foregoing.

202.    The following morning, October 11, 2022, Defendants Goun and Lutz continued exchanging text messages, as noted above.

203.    That day's exchange began with Defendant Lutz confirming that she was in contact with Defendant Newman concerning the case.

204.    Specifically, Defendant Goun and Defendant Lutz had the following exchange:

> Defendant Goun:    Is he [Mr. Goldstein] still turning himself in today?
> Defendant Lutz:    I'm in touch with Larry Newman.
> Defendant Goun:    Ok.
> Defendant Lutz:    He's in the office.  I'm heading in now.

205.    Defendant Goun then immediately changed topics back to pushing Defendant Lutz to pursue criminal charges related to Mr. Goldstein's alleged conduct aimed at their two children.

206.    Defendant Goun texted as follows: "Ok.  For the endangering charge—confirmed kid was there for it."

207.    Then, Defendant Goun texted Defendant Lutz, instituting a despicable turn in their conversation:  "I also have other crummy stuff to tell you related to kids."

208.    The "crummy stuff" to which Defendant Goun referred were false allegations that Mr. Goldstein had physically assaulted Child 1.

209.    Specifically, and as revealed by metadata, Defendant Goun sent Defendant Lutz only two of the three above-mentioned videos and stated as follows:

> Sending video from yesterday – some of this part is new for me, so sending now – yesterday our kids were talking about being there for this door . . . [omitted from discovery] . . . has told me before that joe squeezes him too hard or pulls him too hard and it hurts, or joe pulls his hair, and Joe calls

24

him a jerk and a shit—but I've never had an experience like yesterday hearing our kid plainly explain that Joe does this to him when he is mad at our kid and Joe does this other times when Joe is mad from arguing with me.

210.   Defendant Goun then sent photographs of Child 1's arm, where three bruises were visible.

211.   Mr. Goldstein had nothing to do with these bruises.

212.   Defendant Lutz responded asking Defendant Goun if she also checked Child 2 for bruises.

213.   Defendant Lutz asked that question because, "I need to know if need to open another case."

214.   Defendant Goun took that to mean that Defendant Lutz had already opened up a child assault case concerning Child 1, which was one of her principal aims.

215.   Defendant Goun thus asked Defendant Lutz: "Does that mean—is there now a separate case about our 6 year old [(*i.e.* Child 1)]?"

216.   Defendant Lutz responded: "Yes".

217.   Later that day, October 11, 2022, Defendants Goun and Lutz brought both Child 1 and Child 2 to the Manhattan Child Advocacy Center ("CAC").

218.   Both children gave a video-recorded statement at the CAC.

219.   Defendant Lutz was present for and/or watched the interviews.

220.   Child 2, age 4, began crying immediately, leading to the termination of his interview.

221.   Child 1, age 6, was coached by Defendant Goun as to what to say in the video. Specifically, Child 1 was coached to say that Mr. Goldstein caused bruising on his arm.

222.   Child 1's accusations about Mr. Goldstein were false.

223.   His contentions about Mr. Goldstein were contrary to obvious and easily ascertainable

facts, many of which were already known to Defendants, including Defendant Lutz.

224.    For example, Child 1 identified three occasions on which Mr. Goldstein supposedly hurt him or caused bruises: "yesterday, "last Sunday," and "last Wednesday."

225.    This correlates to October 10, October 9, and October 5.

226.    But Mr. Goldstein did not see Child 1 between the time of the October 8 Incident and the October 11 interview, meaning that he could not have caused any bruising on Child 1 either "yesterday" or "last Sunday."

227.    Defendant Lutz knew that Mr. Goldstein had not seen Child 1 on either October 9 or 10.

228.    Indeed, in a conversation with Mr. Goldstein on the night of October 11 or early morning of October 12, Defendant Lutz specifically acknowledged to Mr. Goldstein that she knew Mr. Goldstein had not seen Child 1 on either of those dates.

229.    Defendant Lutz thus knew that the account Child 1 provided was not true.

230.    Child 1's reference to an incident occurring "last Wednesday" was also false.

231.    Defendant Goun coached Child 1 to falsely state that Mr. Goldstein had caused the bruises and to identify "last Wednesday."

232.    For one example of coaching, Child 1's overly specific reference to "last Wednesday" is telling because—as Defendant Goun knew—that date (October 5) was the last date that Mr. Goldstein had spent any significant alone time with Child 1.

233.    Notably, Child 1 asserted "last Wednesday" almost instantaneously when the CAC interviewer asked when it had occurred, but Child 1 could not explain how he knew it was that day, seven days earlier.

234.    The video shows other signs of obvious coaching, including by the CAC questioner.

235.    For example, in discussing the "last Wednesday" incident, Child 1 stated at first that Mr. Goldstein and Defendant Goun were arguing in the living room and also that "***they*** squeezed me and so now I have a bruise," referring to *both* Defendant Goun and Mr. Goldstein.

236.    The interviewer, however, immediately followed up by skewing Child 1's response, restating it to Child 1 as follows: "so you're saying . . . your Dad got mad at your Mom and then ***he*** squeezed you and now you have a bruise."

### Oct. 11-12, 2022 – Mr. Goldstein is Arrested, Arraigned, and<br>Subject to an Order of Protection

237.    On the morning of October 11, 2022, Mr. Goldstein turned himself into the 20th precinct shortly after 8 a.m. and was arrested based on the October 8 Incident.

238.    This was the first time in Mr. Goldstein's life that he had been arrested, let alone charged with a crime or incarcerated.

239.    A detective in the warrant squad brought Mr. Goldstein upstairs to the 20th Precinct detective squad holding cell.

240.    Mr. Goldstein was held in the detective squad holding cell for at least fourteen hours.

241.    Text messages between Defendants Goun and Lutz confirm that while Mr. Goldstein was being held in the holding cell, Defendant Lutz worked with Defendants Goun and Newman to manufacture and pursue additional false charges against Mr. Goldstein.

242.    Defendant Newman drafted a felony complaint accusing Mr. Goldstein of two felony assaults in the second degree as well as an assault in the third degree and endangering the welfare of a child.

243.    Defendant Lutz signed this complaint shortly after midnight, in the early morning hours of October 12, 2022.

244.    Mr. Goldstein was arraigned the following afternoon, October 12, 2022, after being

held for over thirty-three hours.

245.    At the arraignment, at the request of DANY, the Court issued a temporary order of protection, which it referred to as a "full stay away order of protection" (the "Temporary Order of Protection").

246.    The Court described the order of protection as follows: "The order of protection names Amanda Go[u]n and [Child 1].  You may have nothing to do with these people.  You may not contact them in person, by phone, via text, e-mail, social media.  You may not send them a message through a third person.  You may not go near where they live or work, where they go to school, anyplace you know they will be.  If they contact you, you may not respond.  It doesn't matter who initiates the contact.  If you have any contact with these people, it will violate the order of protection.  If you violate an order of protection, you will be arrested and additional charges will be brought against you for contempt which are as serious as anything you are facing now."

247.    The Court thereafter released Mr. Goldstein on his own recognizance.

**Oct. 12, 2022 – Defendant Newman Drafts a Felony Complaint Against Mr. Goldstein**

248.    Mr. Goldstein was arraigned on the felony complaint Defendant Newman had prepared.

249.    On October 12, 2022, Defendant Newman, despite being an interested witness in the case who was friends with the complainant with whom he conspired to have these knowingly false charges pursued, corruptly drafted and filed a felony complaint charging Mr. Goldstein with three crimes (the "Felony Complaint").

250.    Defendant Newman knew or should have known that these charges were false.

251.    Specifically, the Felony Complaint charged Mr. Goldstein with the following:

     a.  **Assault in the Second Degree** (two counts) in violation of Penal Law § 120.05, concerning Mr. Goldstein's alleged assaults of Defendant Goun and his elder son, Child 1.

    b.  **Assault in the Third Degree** in violation of Penal Law § 120.00, concerning Mr. Goldstein's alleged assault of his elder son, Child 1.

    c.  **Endangering the Welfare of a Child** in violation of Penal Law § 260.10, concerning Mr. Goldstein's alleged causing of substantial pain to his older son, Child 1.

252.   The maximum punishment for these four charges was two to seven years for each count of assault in the second degree.

253.   Defendant Newman primarily relied on his "friend" and colleague in DANY, Defendant Goun, to provide the factual circumstances supporting the Felony Complaint.

254.   On information and belief, Defendant Newman knew at the time he drafted and filed the Felony Complaint that DANY would be disqualified from pursuing the criminal matter against Mr. Goldstein.

255.   There was no probable cause for any of the charges against Mr. Goldstein in the Felony Complaint (or for any other criminal conduct).

256.   Defendants Newman, Lutz, Fabian, and Goun knew that there was no probable cause for any of the charges against Mr. Goldstein in the Felony Complaint (or for any other criminal conduct).

257.   Both Defendants Newman and Goun knew that the sole purpose of filing the Felony Complaint was to assist Defendant Goun personally, *e.g.*, to provide her benefits in her divorce proceeding.

258.   By these acts, Defendant Newman had committed Official Misconduct under New York Penal Law § 195.00.

259.   On information and belief, the NYPD Internal Affairs Bureau ("IAB") later conducted an investigation into Defendant Lutz's handling of this investigation.

260.   On information and belief, the IAB concluded that Defendant Lutz had engaged in an improper and incomplete investigation regarding this matter.

261. On information and belief, the IAB recommended that Defendant Lutz be disciplined as a result.

## Oct. 19, 2022 – DANY is Disqualified and the Bronx DA's Office Takes Over

262. On October 19, 2022, DANY's General Counsel, Leslie Dubeck, e-mailed an application to Administrative Judge Ellen Biben (copying Defendant Newman) seeking the appointment of a Special District Attorney from the Bronx District Attorney's Office ("BxDAO") to prosecute the matter, and seeking the disqualification of the Manhattan DA's office in this matter.

263. Ms. Dubeck's application sought relief "pursuant to Section 701 of the County Law and Section 200.15 of the Uniform Rules for the New York State Trial Courts."

264. As Ms. Dubeck's application states, Section 701 of the County Law contains procedures for cases in which "the district attorney of any county and such assistants as he or she may have . . . are disqualified from acting in a particular case."

265. Although it was DANY that had formally sought the reassignment, it did so by misleadingly representing that there was a mere "appearance" of a conflict.

266. Specifically, in its application, the sole basis it identified for its office's disqualification was the fact that Defendant Goun "is currently employed by DANY as an ADA in the Pathways to Public Safety Division," thus misleading judges and the BxDAO.

267. The application made no mention of the fact that the prosecutor who filed the Felony Complaint—Defendant Newman—was a witness in the case, a personal friend of the complaining witness, and involved in other ways as set forth above (*e.g.*, effectively drafting the Domestic Incident Report).

268. On information and belief, Defendant Newman knew at all times and before drafting and filing the Felony Complaint that DANY and he in particular would be disqualified from pursuing

the criminal case against Mr. Goldstein.

**February 2023 – Defendant Goun Makes *Another* False Criminal Report to the NYPD**

269.    On February 10, 2023, Justice Ariel D. Chesler, the judge presiding over the matrimonial action, signed a stipulation and order authorizing a carve-out of the Temporary Order of Protection (the "Carve-Out Order").

270.    As relevant here, the Carve-Out Order specifically allowed Defendant Goun and Mr. Goldstein to communicate with each other regarding the children's health, education, or well-being.

271.    The Carve-Out Order allowed Defendant Goun and Mr. Goldstein to forward information to one another so long as a third party was included as a recipient.

272.    The Carve-Out Order also specifically stated that inadvertently neglecting to include a third party would not result in an automatic violation of the Temporary Order of Protection.

273.    As alleged below, Defendant Goun made a knowingly false police report to the NYPD accusing Mr. Goldstein of violating the Carve-Out Order.

274.    On February 11, 2023, Mr. Goldstein's attorney notified Defendant Goun's attorney via e-mail that Mr. Goldstein had agreed to pay their children's 2023-2024 tuition.

275.    Mr. Goldstein inadvertently forwarded a draft of that same e-mail to Defendant Goun without copying a third party.

276.    Defendant Goun reported Mr. Goldstein's inadvertent e-mail to the police seeking his arrest for criminally violating the Temporary Order of Protection.

277.    Specifically, on February 19, Defendant Goun called 911 and told responding officers that Mr. Goldstein had violated the Temporary Order of Protection by forwarding her the e-mail on February 11.

278.    On February 21, Defendant Goun told more officers about the e-mail.

31

279.    But Defendant Goun knew that the Carve-Out Order expressly allowed direct communication concerning the education of their children and did not prohibit inadvertent communications without a third party.

280.    Defendant Goun thus knew that Mr. Goldstein had not violated the modified Temporary Order of Protection by way of his February 11 e-mail.

281.    Defendant Goun reported the February 11 e-mail to the police knowing that it could have resulted in Mr. Goldstein's immediate arrest.

282.    Moreover, Defendant Goun concealed the existence of the Carve-Out Order in her communications with the police.

283.    In both communications with the police, on February 19 and February 21, Defendant Goun intentionally led officers to believe the original "no contact" order from the Temporary Order of Protection was still in effect.

284.    On February 21, when Mr. Goldstein was waiting on the street corner down the block from the marital apartment for a court-ordered visit with Child 2, he was surrounded by more than ten NYPD police officers.

285.    Mr. Goldstein was in full view of former neighbors and passersby as he was surrounded on a busy corner on Broadway by more than ten police officers.

286.    Passersby stopped or slowed down to watch the scene.

287.    When confronted by the officers concerning Defendant Goun's allegations that Mr. Goldstein had violated the Temporary Order of Protection, Mr. Goldstein showed the officers a copy of the Carve-Out Order (which Defendant Goun had failed to show them).

288.    Mr. Goldstein also explained that the e-mail in question pertained to education.

289.    The officers then confronted Defendant Goun, as captured by BWC.

290.    One officer told Defendant Goun, "You didn't tell us there was a stipulation."

291.    The "stipulation" referred to by that officer was the Carve-Out Order.

292.    The officer asked to see the e-mail and reviewed it.

293.    Out of earshot of Defendant Goun, one of the officers mentioned to another, "She's smart.  She didn't mention the stipulation.  Why would you not mention the stipulation?"

294.    The other officer responded, "She's a district attorney."

295.    The first officer stated, "That's wrong though."

296.    The officer stated, "The fact that you're saying you don't want to report it means that you know that you can."

297.    This exchange is captured on the officers' BWC footage.

298.    One of the officers apologized to Mr. Goldstein.

**March 2023 – DANY (Not the BxDAO) Files a Superseding Misdemeanor Information**

299.    Following the reassignment to BxDAO, the criminal case was led by ADA Jennifer Esposito, a 2019 law school graduate who had been with BxDAO for less than four years.

300.    On information and belief, and despite DANY's disqualification from the case, ADA Esposito was in frequent communication with Defendant Newman concerning the case.

301.    For example, on November 21, 2022, at the first status call of the criminal case, Defendant Newman was present in the courtroom and spoke to ADA Esposito.

302.    At that status call, and after speaking with Defendant Newman, ADA Esposito requested that the court include Child 2 in a renewed order of protection, despite the complete lack of any evidence that would support such an order.

303.    When the court asked ADA Esposito about the basis for her request to include Child 2 in the order of protection, she offered no evidence or argument in support other than saying that

Child 2 might be a witness, although she did not claim that he was (or had witnessed anything at all).

304.    At that status call, the court declined the request to include Child 2 in the order.

305.    In March 2023, after having the case for more than four months, the BxDAO decided to reduce the charges against Mr. Goldstein from felonies to misdemeanors and ADA Esposito informed the court of the same.

306.    ADA Esposito also represented to the court that she intended to dismiss the assault charge pertaining to Child 1.

307.    Oddly, however, it was not ADA Esposito or the BxDAO that prepared the superseding misdemeanor information.

308.    Rather, on March 20, 2023, despite the court's order disqualifying DANY and its attorneys from the criminal matter, Defendant Keating of DANY prepared and filed a superseding misdemeanor information against Mr. Goldstein (the "Superseding Misdemeanor Information").

309.    The Superseding Misdemeanor Information charged Mr. Goldstein with the following:

> a.  **Assault in the Third Degree** (two counts) in violation of Penal Law § 120.00(1), concerning Mr. Goldstein's alleged assaults of Defendant Goun and Child 1.
>
> b.  **Endangering the Welfare of a Child** (three counts) in violation of Penal Law § 260.10(1), concerning Mr. Goldstein's alleged causing of substantial pain to Child 1, as well as both children's alleged witnessing of the alleged assault of Defendant Goun.
>
> c.  **Harassment in the Second Degree** (two counts) in violation of Penal Law § 240.26(1) claiming that Mr. Goldstein's actions caused "annoyance, alarm, and fear" in both Defendant Goun and Child 1.

310.    On information and belief, Defendant Keating filed the Superseding Misdemeanor Information in coordination and agreement with Defendants Newman and Goun.

311.    Although the Superseding Misdemeanor Information reduced the extant assault and child endangerment charges against Mr. Goldstein from felonies to misdemeanors, it expanded the

allegations against Mr. Goldstein in significant ways.

312.    For one, the Superseding Misdemeanor Information for the first time implicated Child 2, falsely naming him as a victim of his father's alleged actions.

313.    Although the Felony Complaint had made no reference to or in any way implicated Child 2, the Superseding Misdemeanor Information alleged that Mr. Goldstein was guilty of Endangering the Welfare of a Child because Mr. Goldstein allegedly assaulted Defendant Goun "within earshot" of Child 2.

314.    The Superseding Misdemeanor Information also revived the assault allegation involving Child 1 that ADA Esposito had represented to the court she would dismiss.

315.    The Superseding Misdemeanor Information also brought a total of seven charges whereas the Felony Complaint brought a total of four charges.

316.    Defendant Keating, however, had no probable cause to believe that Mr. Goldstein had committed any of the charges in the Superseding Misdemeanor Information.

317.    Defendant Keating's preparation and filing of the Superseding Misdemeanor Information was taken in the absence of any jurisdiction given that her office had been disqualified from prosecuting the matter.

### May 2023 – Defendant Goun Finally Produces Her October 8, 2022 Video Recording

318.    Between January and May of 2023, ADA Esposito produced discovery to Mr. Goldstein in the criminal case.

319.    Initially, none of that discovery included the video recording that Defendant Goun took of the October 8 Incident.

320.    Indeed, on information and belief, Defendant Goun had never provided that video recording to law enforcement personnel or prosecutors and it thus had not become part of the case

files of the NYPD, DANY, or BxDAO.

321.    Defendants Newman and Lutz knew that the video existed, and that it had been part of the basis for the responding officers' determination that no crime occurred, yet both kept it out of the case file.

322.    Defendant Goun failed to provide the video recording because she knew the video recording undermined the false assault allegations that she had proffered.

323.    In May 2023, ADA Esposito asked Defendant Goun to finally produce that video recording.

324.    On May 10, 2023, Defendant Goun for the first time produced the video recording and ADA Esposito then produced it to Mr. Goldstein.

## May 8, 2023 – Mr. Goldstein Files a *Clayton* Motion

325.    On May 8, 2023, Mr. Goldstein filed what is known as a *Clayton* motion.

326.    A *Clayton* motion asks a court to dismiss criminal charges in the interests of justice.

327.    New York courts have made clear that such a motion may only be granted "in that 'rare' or 'unusual' case where it 'cries out for fundamental justice beyond the confines of conventional considerations.'"[4]

328.    *Clayton* motions are governed by N.Y. Criminal Procedure Law 170.40, which allow for dismissal of a criminal complaint or information "even though there may be no basis for dismissal as a matter of law," where "such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such accusatory instrument or count would constitute or result in injustice."

---

[4] *People v. Insignares*, 109 A.D.2d 221, 234 (1st Dep't 1985) (citation omitted).

329.    Section 170.40 identifies 10 factors for a court to assess in determining whether a criminal complaint should be dismissed in the interests of justice.

330.    Mr. Goldstein's motion relied almost singularly on just one of these factors, C.P.L. 170.40(1)(e), which provides that a criminal complaint or information may be dismissed upon a finding of "exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant."

331.    The "exceptionally serious misconduct" identified by Mr. Goldstein's *Clayton* motion was the aforementioned conduct of Defendants Newman and Goun.

332.    As the motion indicated, "[t]ogether with this supervisory ADA [Defendant Newman], the complainant arranged to charge [Mr. Goldstein] with multiple felony offenses, even though the D.A.'s Office conducted no investigation whatsoever . . . As depicted by the BWC footage, [Mr. Goldstein] was arrested solely because the complainant actively circumvented the NYPD, its normal processes, and its investigation and availed herself of her own prosecutor's office to cause him to be arrested, imprisoned, and charged with multiple felony offenses—all for her own private benefit."

333.    As the motion correctly concluded: "[i]t would be hard to imagine a more serious form of law enforcement misconduct."

### June 14, 2023 – Rather than Respond to the *Clayton* Motion, BxDAO Dismisses All Charges Because it "Will be Unable to Meet [Its] Burden of Proof at Trial"

334.    The People's response to Mr. Goldstein's *Clayton* motion was due on May 26, 2023.

335.    The People did not file a response to Mr. Goldstein's *Clayton* motion.

336.    Rather, on June 12, 2023, ADA Esposito informed the Court as follows: "The People anticipate dismissing this case on Wednesday, June 14, 2023 as we will not be able to meet our burden of proof at trial.  Given this, we do not intend to respond to the motion."

337.    On June 14, 2023, the BxDAO asked the Court to dismiss all charges against Mr. Goldstein.

338.    As the prosecuting ADA told the Court: "we will be unable to meet our burden of proof at trial" and "we cannot meet our burden of proof."

339.    The Court then dismissed all charges against Mr. Goldstein.

**February 2025 – Defendant Goun *Again* Coaches Child 1 to Tell False
Stories of Assault by Mr. Goldstein, but the NYPD Shuts It Down Given Their
Knowledge of Defendant Goun's "Malicious" History of "Coaching" the Children**

340.    In February 2025, Defendant Goun yet again coached Child 1 to falsely tell a mandatory reporter that Mr. Goldstein had physically harmed him.

341.    Specifically, Child 1 falsely told his therapist, a mandatory reporter, that Mr. Goldstein had physically harmed him during a weekend day when Mr. Goldstein had custody of Child 1 and Child 2.

342.    Mr. Goldstein did not physically harm Child 1 on that day (or ever).

343.    On information and belief, Defendant Goun coached Child 1 to tell this false story to the child's therapist so that Mr. Goldstein would ultimately be subject to criminal process.

344.    The therapist reported the incident to the authorities (as she was required to do), just as Defendant Goun had desired.

345.    The NYPD conducted a thorough investigation into the incident and determined not to pursue any charges against Mr. Goldstein.

346.    The NYPD's stated basis for not pursuing any charges against Mr. Goldstein was both the incredibility and inconsistency of Child 1's story and Defendant Goun's documented history of coaching her children to tell false stories about Mr. Goldstein.

347.    The NYPD determined that the reports were the result of Defendant Goun's "malicious" conduct and that she was "using the children against him."

348.   The NYPD determined that "we do feel that there is coaching that's going on and that she might be utilizing the system for her benefit."

349.   The NYPD noted that "there are many parallels between the current investigation and past reports," which was a reference to past reports that Defendant Goun had coached her children to tell false stories about Mr. Goldstein.

350.   The NYPD concluded that Defendant Goun had claimed this latest incident happened in Brooklyn to take it out of DANY's jurisdiction because officials in Manhattan knew about Defendant Goun's prior misconduct.

## V.   Defendant Goun's Immediate, Repeated, and Successful Reliance in the Divorce Proceeding on the False Criminal Charges She Orchestrated

351.   As alleged above, one of Defendants Newman and Goun's principal aims in orchestrating false criminal charges against Mr. Goldstein was to secure benefits for Defendant Goun in the divorce action.

352.   Almost immediately after these defendants orchestrated the criminal charges, Defendant Goun sought—and obtained—those very benefits, some of which are laid out below.

353.   As explained above, Mr. Goldstein was arraigned on October 12, 2022, and the Temporary Order of Protection was entered against him.

354.   On October 13, 2022, the day after Mr. Goldstein was arraigned on the false charges orchestrated by Defendants Newman and Goun, Defendant Goun's attorney supplemented her October 6 OTSC with, *inter alia*, an affirmation ("October 13 Attorney's Affirmation") and a copy of the Temporary Order of Protection.

355.   In reliance upon the October 13 Attorney's Affirmation, Defendant Goun sought to have the court officially grant her exclusive use of the marital apartment and sole custody of the children.

356.    In furtherance of that aim, the October 13 Attorney's Affirmation falsely accused Mr. Goldstein of assaulting Defendant Goun on October 8, 2022.

357.    The October 13 Attorney's Affirmation stated that Mr. Goldstein had been charged with "at least a felony second-degree assault and misdemeanor endangering the welfare of a child."

358.    The October 13 Attorney's Affirmation did not disclose that those charges were based on false reports from and orchestrated by Defendant Newman and Goun.

359.    The October 13 Attorney's Affirmation noted that the "Temporary Orders of Protection (not to mention the events underlying same) obviously directly relate to the emergency applications pending before this Court."

360.    On October 31, 2022, Defendant Goun and Mr. Goldstein had their first appearance in front of Supreme Court Justice Chesler in the divorce action ("October 31 Appearance").

361.    At the October 31 Appearance, Defendant Goun's attorney falsely represented to the court that "domestic violence" had occurred in the marital apartment, which was based entirely on Defendant Goun's false account of the October 8 Incident.

362.    At the October 31 Appearance, Defendant Goun's attorney falsely represented that Child 1 had "bruises all over him."

363.    At the October 31 Appearance, Justice Chesler stated that the foregoing allegations against Mr. Goldstein were very serious.

364.    Justice Chesler stated that "based on the allegations and the criminal court order" it was "appropriate" to order that Mr. Goldstein could not see his children except for supervised visits.

365.    At the October 31 Appearance, Justice Chesler also entered an interim order (the "October 31 Interim Order") noting that Defendant Goun's request for exclusive use of the marital residence was now moot (because of the Temporary Order of Protection) and directing Mr. Goldstein

to maintain the financial status quo.

366.    Thus, as a direct consequence of Defendant Goun's orchestration of false criminal charges against Mr. Goldstein, Mr. Goldstein was (among other things) severely limited in interacting with his children, not allowed to enter his home, and forced to incur significant financial cost.

367.    On November 18, 2022, Justice Chesler entered a further order (the "November 18 Interim Order") allowing Mr. Goldstein a mere four hours of supervised visitation with his children per week, with Mr. Goldstein being required to cover the cost of supervision (prior to that order, Mr. Goldstein had not been able to see his children for over three weeks).

368.    The supervision, which was provided by a social work agency called Comprehensive Family Services ("CFS"), cost approximately $5,000 to $6,000, or more, per month.

369.    Desperate to see his children even for the limited time allowed him, Mr. Goldstein paid for the full cost of the supervision.

370.    On May 12, 2023, Justice Chesler issued a Decision and Order on Defendant Goun's October 6 OTSC ("May 2023 Decision and Order").

371.    The May 2023 Decision and Order again provided Defendant Goun significant benefits expressly based on Defendant Goun's false allegations.

372.    For example, the May 2023 Decision and order directed Mr. Goldstein to pay $10,500 per month in support to Defendant Goun and explicitly stated that Defendant Goun's allegations of domestic violence were a factor in reaching such a high amount.

373.    The May 2023 Decision and Order also ordered Mr. Goldstein to pay Defendant Goun $50,000 to cover *her* legal fees, on the ground that it was *Mr. Goldstein*'s "behavior [that] necessitated additional litigation in this Court and criminal court as well as significant attorney time related to custody, supervised visitation, and order of protection concerns."

374.    The May 2023 Decision and Order also provided that Defendant Goun could maintain exclusive use of the marital apartment, an issue the Court believed to be "moot and/or resolved" by the Temporary Order of Protection (that was issued due to Defendant Goun's false allegations).

## VI.    All Stakeholders Learn That Defendant Goun's Stories Were False and Manufactured

375.    As alleged below, every neutral party involved in these matters came to learn that Defendant Goun's allegations against Mr. Goldstein were false, including: (i) the BxDAO; (ii) the attorney appointed to represent the children's interests in the divorce proceeding; (iii) the city agency responsible for investigating and prosecuting child abuse and neglect and which thrice investigated Defendant Goun's allegations; (iv) the caseworkers assigned to supervise Mr. Goldstein's parenting time; (v) the forensic psychologist appointed to aid in the custody determination in the divorce proceeding; and (vi) the Judge presiding over the divorce proceeding.  What's more, many of these neutral observers also separately concluded that Defendant Goun had coached her children to make false reports that Mr. Goldstein had physically harmed them.

### a.    BxDAO Drops All Charges Against Mr. Goldstein Because It Would "Not be Able to Meet [Its] Burden of Proof at Trial" for Any of Them

376.    As detailed above, in June 2023, after having earlier downgraded the criminal charges against Mr. Goldstein from felonies to misdemeanors, the BxDAO dismissed the criminal case entirely against Mr. Goldstein.

377.    On June 12, 2023, ADA Esposito informed the court as follows: "The People anticipate dismissing this case on Wednesday, June 14, 2023 as we will not be able to meet our burden of proof at trial.  Given this, we do not intend to respond to the motion."

378.    The "motion" to which ADA Esposito referred was Mr. Goldstein's *Clayton* motion, seeking the dismissal of the criminal case on the grounds of misconduct by Defendants Newman and Goun.

379.    On June 14, 2023, the BxDAO requested that the Court dismiss all charges against Mr. Goldstein.

380.    As ADA Esposito told the court: "After a review of the evidence, we will be unable to meet our burden of proof at trial" and "we cannot meet our burden of proof."

381.    The court subsequently dismissed all charges against Mr. Goldstein and vacated the Temporary Order of Protection.

**b.    The Attorney for the Children ("AFC") Concludes Defendant Goun's Allegations of Child Assault Are "Just Not Credible" While Also Confirming She "Coaches" Children to Make False Accusations Against Mr. Goldstein**

382.    On December 12, 2022, the matrimonial court appointed an AFC to represent Child 1 and Child 2.

383.    An AFC is appointed to singularly and zealously represent the interests of the children in contested custody proceedings.

384.    In custody proceedings, an AFC "must zealously advocate the child's position."  N.Y. Ct. R. 7.2(d).

385.    The AFC appointed to represent Child 1 and Child 2, based on her experience and interactions with Mr. Goldstein, Defendant Goun, and the children, reached a clear judgment that Mr. Goldstein had not physically harmed the children.

386.    As she reported: "that's just not credible in the face of my own interactions, CFS's interactions, and [Child 1's therapist]'s."

387.    As for the October 2022 charges against Mr. Goldstein, the AFC stated that Child 1 "has given me alternate versions for want of a better word."

388.    The AFC told the matrimonial court on the record that she had "reason to believe that– that the children are being, frankly, coached to make accusations against Mr. Goldstein."

389.    The AFC noted that the CFS reports "reflect how both children, and particularly [Child 1], have been recruited to do [Defendant Goun's] bidding."

390.    The AFC noted that the children "are being used in this case," referring to the divorce case.

391.    The AFC told the court that Defendant Goun "tells the children what to say to me."

392.    The AFC told the court that Defendant Goun attempted to "control the narrative coming from the children."

393.    The AFC noted that "the children are very vulnerable and malleable in terms of making certain claims to whoever wants to listen to them."

394.    The AFC repeatedly opposed Defendant Goun's attempts to reinstate supervision over Mr. Goldstein's parenting time.

395.    The AFC opposed Defendant Goun's attempt to secure another order of protection on Child 1's behalf.

396.    At the May 21, 2024 conference, the AFC noted on the record that the forensic psychologist's report (discussed below) "vindicates the concerns I've been raising before this Court [since] shortly after my appointment."

### c. ACS Declines to Pursue Defendant Goun's Initial Accusations and Finds Both of Her Later Accusations "Unfounded"

397.    The New York City Administration for Children's Services ("ACS") is a city agency that, among other things, conducts investigations of suspected child abuse or neglect.

398.    ACS is required to take action when it receives a report that a child may be in danger.

399.    ACS files a petition pursuant to Family Court Act Article 10 ("Article 10") when it has sufficient facts to establish that a child is an abused or neglected child as those terms are defined by Family Court Act §§ 1012(e)-(f).

400.    As alleged below, Defendant Goun caused at three separate ACS investigations to be instigated against Mr. Goldstein and ACS declined to pursue cases against Mr. Goldstein in all of them.

401.    ACS first opened an investigation into Mr. Goldstein following Defendant Goun's false allegations in October 2022 that led to his arrest.

402.    ACS spoke with Defendant Newman on October 13, 2022, after being informed that he was the ADA assigned to the criminal case.

403.    Defendant Newman vouched for the charges against Mr. Goldstein, without disclosing his own misconduct or conflict.

404.    ACS completed this investigation of Mr. Goldstein on December 6, 2022.

405.    ACS declined to file any Article 10 petition against Mr. Goldstein.

406.    In late 2023, Defendant Goun orchestrated a second ACS investigation into Mr. Goldstein.

407.    This time, Defendant Goun orchestrated a campaign to launder false allegations that Mr. Goldstein harmed their children through mandated reporters.

408.    Defendant Goun did so because she did not want the allegations to appear as if they were coming from her.

409.    For example, Defendant Goun coached the children to falsely report to their therapists during sessions held the week of December 4, 2023, that Mr. Goldstein had pushed Child 1, causing Child 1 to hit his head, and that Child 2 had witnessed this.

410.    Defendant Goun called Child 1's therapist ahead of his scheduled appointment to inform the therapist that Child 1 had troubling information about Mr. Goldstein.

411.    Neither child, however, ultimately told their respective therapists the false story that

Defendant Goun had coached them to report.

412.   Rather, both children subsequently told their therapists or court-appointed officials that their mother, Defendant Goun, had told them to say certain things about their father.

413.   For another example, on or about December 8, 2023, Defendant Goun pressured Child 2 into telling his teacher that he saw Mr. Goldstein push Child 1.

414.   Defendant Goun had drawn a symbol on Child 2's hand to remind him to make this allegation to his teacher.

415.   But Child 2 subsequently denied witnessing or knowing anything about his father pushing Child 1, including to the AFC.

416.   In light of reports from the mandated reporters through which Defendant Goun laundered these false stories, however, ACS started a new investigation into Mr. Goldstein.

417.   This second ACS investigation resulted in a specific finding that the allegations were "unfounded."

418.   Notes from the second ACS investigation indicated that both children were happy and in good moods when they were with their father and that both children felt safe around their father and enjoyed seeing him.

419.   On February 21, 2024, Mr. Goldstein received a letter from the New York State Office of Children and Family Services ("February 21, 2024, Letter").

420.   The February 21, 2024, Letter informed Mr. Goldstein that ACS "did an investigation and decided the report was unfounded."

421.   This meant that ACS "did <u>not</u> find a fair preponderance of the evidence that the child(ren) was abused or maltreated."

422.   ACS again did not file an Article 10 petition.

423.    As alleged above, Defendant Goun *yet again* coached Child 1 to make false accusations against Mr. Goldstein in February 2025, this time to his therapist, a mandatory reporter.

424.    As a mandatory reporter, the therapist was obliged to report the false accusations to the authorities.

425.    ACS was thus required to conduct yet another investigation of Mr. Goldstein.

426.    On May 2, 2025, Mr. Goldstein received another letter from the New York State Office of Children and Family Services, which informed him that ACS "did an investigation and decided the report was unfounded."

427.    This meant that ACS "did <u>not</u> find a fair preponderance of the evidence that the child(ren) was abused or maltreated."

### d. Comprehensive Family Services ("CFS") Issues Reports Directly and Repeatedly Contradicting Defendant Goun's Allegations

428.    The matrimonial court also appointed "CFS" to facilitate Mr. Goldstein's supervised visits with his children.

429.    Social workers employed by CFS observed all of Mr. Goldstein's visits with his children through June 2023.

430.    CFS submitted detailed reports of the social workers' observations ("CFS Reports").

431.    The CFS Reports showed no wrongdoing by Mr. Goldstein.

432.    To the contrary, the CFS Reports consistently referred to Mr. Goldstein's interactions with his children as warm, positive, appropriate, and engaged.

433.    The CFS reports repeatedly contradicted Defendant Goun's allegations about the visits.

### e. Court-Appointed Forensic Psychologist Concludes Mr. Goldstein Never Harmed the Children and that Defendant Goun Coached Them to Falsely Say He Did

47

434.   The matrimonial court also appointed a psychologist to serve as a neutral forensic evaluator.

435.   Trial courts presiding over contested custody issues often appoint forensic evaluators to assist in custody determinations.

436.   Forensic evaluators are appointed to render neutral reports based upon examinations of the children and the parents.

437.   In May 2024, after dozens of interviews over the course of a year, the forensic psychologist submitted a 108-page report.

438.   The report unequivocally vindicated Mr. Goldstein and implicated Defendant Goun.

439.   The forensic psychologist found that Mr. Goldstein posed no danger to the children.

440.   That finding was based on multiple lines of evidence.

441.   Child 1 told the forensic psychologist multiple times that he had never been physically hurt by either of his parents.

442.   Both Child 1 and Child 2 reported that Defendant Goun told them to tell the forensic psychologist various things about their father.

443.   The forensic psychologist opined that Defendant Goun was causing potential damage to the children by exposing them to police intervention and by involving ACS investigators repeatedly in the children's lives.

444.   The forensic psychologist concluded Defendant Goun had coached the children to make accusations against their father.

**f.   Justice Chesler (Presider over Divorce Action)**

445.   As alleged below, Justice Chesler repeatedly expressed his concern with Defendant Goun's misconduct as it came to light through the various agencies and individuals identified above.

446.   After the BxDAO dismissed all charges against Mr. Goldstein, Justice Chesler ordered

48

that Mr. Goldstein's parenting time be unsupervised by July 31, 2023.

447.   Further, at conferences held on December 13, 2023, and January 16, 2024, Justice Chesler repeatedly asked why Defendant Goun's attorneys were using the word "abuse" in light of the dismissal of the criminal charges and other exculpatory evidence.

448.   On January 25, 2024, Justice Chesler issued a decision and order ("January 2024 Decision and Order") noting that the "Court has expressed its concerns about [Defendant Goun's] influence of the children, misuse of the temporary order of protection, and her inability to move forward in this case in line with the Court's directives."

449.   The January 2024 Decision and Order noted that Defendant Goun "refuses to consider the assessments of CFS, the Bronx District Attorney's Office, the AFC, and this Court."

450.   Upon information and belief, the court's references to "the assessments of CFS, the Bronx District Attorney's Office, the AFC, and this Court," are references to the foregoing authorities' assessments that Mr. Goldstein had not committed the misconduct of which Defendant Goun accused him or that Defendant Goun had coached her children to make false accusations about Mr. Goldstein.

451.   The January 2024 Decision and Order noted, in reference to the ACS's second investigation, that "[i]n fact, most recently there is another ACS investigation of [Mr. Goldstein] due to [Defendant Goun's] belief that the children are being 'abused.'"

452.   The January 2024 Decision noted that "[o]n this point, the Court notes that ACS has been making weekly visits to [Mr. Goldstein's] home and has not removed the children or filed an Article 10 petition."

453.   Justice Chesler noted that, "the Court is now concerned that it is [Defendant Goun]'s litigation tactics, positions, and other behavior that is unnecessarily increasing both parties' counsel fees and prolonging the action."

454.    Despite Defendant Goun's request for $150,000 in attorneys' fees, Justice Chesler awarded Defendant Goun only an additional $75,000 in attorney's fees (previously, Justice Chesler had awarded Defendant Goun all the attorneys' fees she had requested).

## VII.    The Foregoing Caused Mr. Goldstein Devastating, Ongoing, and Permanent Damages

455.    Defendants' actions have caused immense damage to Mr. Goldstein.

456.    As Mr. Goldstein is a loving and involved father, the most consequential harm caused by Defendants is the significant and permanent damage to his relationships with his children, and especially Child 1.

457.    For eight months, Mr. Goldstein was only permitted to see his children for a few hours per week during supervised visitation and supervised FaceTime calls.

458.    Mr. Goldstein's children were falsely and repeatedly told that they were not safe with their father and were subjected to countless interviews with state actors in which they were pressured by Defendant Goun and others to falsely claim that their father had hurt them.

459.    Mr. Goldstein's children were confused and hurt by the sudden disappearance of their father from their lives and asked him many times why they could not spend more time with Mr. Goldstein and expressed their belief that Mr. Goldstein had abandoned them.

460.    Mr. Goldstein has experienced severe emotional distress as a result of Defendants' manufactured charges and abuse of process and the impact they have had on, among other things, his relationship with his children.

461.    Mr. Goldstein experienced and continues to experience extreme distress at witnessing the traumatic effects of Defendants' actions on his children.

462.    Mr. Goldstein experienced and continues to experience extreme distress at having to worry every day whether Defendant Goun will continue to use her position of authority to pursue false criminal charges against him.

463.    Mr. Goldstein experienced and continues to experience extreme distress while parenting his children that Defendant Goun will purposefully and falsely misconstrue some event as a basis to pursue false criminal charges against Mr. Goldstein.

464.    Mr. Goldstein suffered a loss of liberty for the 33 hours he was detained and the several instances in which he was compelled to appear in criminal court.

465.    Mr. Goldstein has also suffered serious reputational harm due to the shocking but false charges brought against him and the fact that his employer, family, and friends, as well as educators and staff at his children's school, learned about them.

466.    Mr. Goldstein has also suffered and continues to suffer substantial economic damages caused by Defendants' unlawful conduct, including but not limited to: (i) significant legal expenses in defending against the false criminal charges orchestrated, initiated, and/or continued by Defendants; (ii) significant costs of supervised visitation of his children; (iii) costs of therapy for his children; (iv) costs of a forensic evaluator; (v) costs for the AFC; (vi) fees paid to Mr. Goldstein's divorce attorneys; (vii) fees and costs paid to Defendant Goun's attorneys; (viii) inflated interim support payments to Defendant Goun; and (ix) loss of use of the property which Defendant Goun stole.

## CAUSES OF ACTION

### COUNT I

**Abuse of Process—42 U.S.C. § 1983**
**(Defendants Newman and Goun)**

467.    Mr. Goldstein repeats each allegation above as if set forth herein.

468.    By pursuing and initiating criminal charges against Mr. Goldstein, Defendants Newman and Goun employed regularly issued legal process to compel performance or forbearance of some act, *e.g.*, causing Mr. Goldstein to be held in custody and face criminal and other legal

process.

469.    There was no probable cause for any of the criminal charges initiated against Mr. Goldstein.

470.    Defendants Newman and Goun knew that the charges they pursued and initiated were false (and not supported by probable cause) and they issued legal process against Mr. Goldstein nonetheless with the intent to cause Mr. Goldstein harm and without excuse or justification.

471.    Defendants Newman and Goun used the criminal process in a perverted manner to obtain a collateral objective that is outside the legitimate ends of the process.

472.    Defendant Goun used the criminal process to obtain tangible benefits in her divorce proceedings.

473.    Defendant Goun used the criminal process to try to avoid accountability for her own criminal conduct.

474.    Defendant Newman used the criminal process to help his friend, Defendant Goun, obtain tangible benefits in her divorce proceedings, including benefits transferred from Mr. Goldstein to Defendant Goun.

475.    Defendant Newman used the criminal process and the order of protection to wrongfully and extortionately transfer property, real and personal, and intangible parent-child interests from Mr. Goldstein to Defendant Goun under color of official right.

476.    The foregoing conduct of Defendants Newman and Goun were actions they each took under color of state law, including but not limited to conduct undertaken in connection with state officials and with significant state aid.

477.    At all relevant times, Defendants Newman and Goun were not acting in a prosecutorial capacity, but rather were acting solely to further Ms. Goun's private interests, in an

investigative capacity, and/or in the clear absence of all jurisdiction.

478.     As a result of the foregoing actions of Defendants Newman and Goun, Mr. Goldstein suffered a denial of his constitutional rights pursuant to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and substantial consequential damages.

## COUNT II
### Violation of New York Judiciary Law § 487
### (Defendants Newman and Goun)

479.     Mr. Goldstein repeats each allegation above as if set forth herein.

480.     Defendants Newman and Goun were at all relevant times attorneys licensed to practice law in the state of New York.

481.     Defendant Newman was admitted to the New York bar on February 26, 2003, with Bar Registration #4091641.

482.     Defendant Goun was admitted to the New York bar on May 19, 2010, with Bar Registration #4799094.

483.     Defendants Newman and Goun are each guilty of extreme and egregious deceit, by deceiving the Criminal Court of the City of New York principally by way of pursuing and proffering false criminal allegations against Mr. Goldstein that were not supported by probable cause.

484.     Defendants Newman and Goun are each guilty of extreme and egregious collusion, by agreeing together to pursue and proffer false criminal allegations against Mr. Goldstein to the Criminal Court of the City of New York.

485.     Defendants Newman and Goun carried out their deceit and their collusion with the intent of deceiving the courts of the State of New York, including the Criminal Court of the City of New York, as well as the People of the State of New York and Mr. Goldstein.

486.     At all relevant times, neither Defendants Newman nor Goun were acting in a

prosecutorial capacity, but rather were acting entirely to further Defendant Goun's private interests, in an investigative capacity, and/or in the clear absence of all jurisdiction.

487.    As a result of the foregoing actions of Defendants Newman and Goun, Mr. Goldstein suffered significant actual damages.

488.    As a result of the foregoing, Mr. Goldstein is entitled to treble damages.

## COUNT III

### Malicious Prosecution—42 U.S.C. § 1983
### (All Defendants)

489.    Mr. Goldstein repeats each allegation above as if set forth herein.

490.    By way of the foregoing, each of the Defendants played an active role in initiating, causing the initiation, and/or continuing a criminal proceeding against Mr. Goldstein.

491.    Each Defendant played an active role in the prosecution.

492.    Through the foregoing, each Defendant caused Mr. Goldstein to be deprived of his liberty.

493.    The termination of the criminal proceeding was in Mr. Goldstein's favor when all charges against him were dismissed on June 14, 2023.

494.    There was never probable cause to initiate or continue a criminal prosecution of Mr. Goldstein for any charge.

495.    Each Defendant acted with malice.

496.    The foregoing conduct of Defendants Newman, Goun, Keating, Lutz, and Fabian were actions they each took under color of state law, including but not limited to conduct undertaken in connection with state officials and with significant state aid.

497.    At all relevant times, neither Defendants Newman, Goun, nor Keating were acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or

in the clear absence of all jurisdiction.

498.    As a result of the foregoing actions of Defendants, Mr. Goldstein suffered a denial of his constitutional rights pursuant to the Fourth. Fifth, and Fourteenth Amendments and substantial damages as a result.

## COUNT IV

### False Arrest—42 U.S.C. § 1983
### (Defendants Newman, Goun, Lutz, and Fabian)

499.    Mr. Goldstein repeats each allegation above as if set forth herein.

500.    By way of the foregoing, Defendants Newman, Goun, Lutz, and Fabian intended to confine Mr. Goldstein by way of an arrest for alleged criminal conduct, and such an arrest took place on October 11, 2022.

501.    Mr. Goldstein was conscious of and did not consent to the confinement.

502.    The confinement of Mr. Goldstein was without probable cause and was not otherwise privileged.

503.    The foregoing conduct of Defendants Newman, Goun, Lutz, and Fabian were actions they each took under color of state law, including but not limited to conduct undertaken in connection with state officials and with significant state aid.

504.    At all relevant times, neither Defendants Newman nor Goun were acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or in the clear absence of all jurisdiction.

505.    As a result of the foregoing actions of Defendants, Mr. Goldstein was deprived of his rights pursuant to the Fourth and Fourteenth Amendments to the Constitution and suffered significant damages as a result.

## COUNT V

### Violation of New York City Administrative Code § 8-803
### (Defendants Lutz and Fabian)

506.     Mr. Goldstein repeats each allegation above as if set forth herein.

507.     Defendants Lutz and Fabian were at all relevant times employees of the New York City Police Department acting under color of law, ordinance, rule, regulation, custom, and usage.

508.     By way of the foregoing, Defendants Lutz and Fabian caused Mr. Goldstein to be subjected to a deprivation of his right to be secure in his person against unreasonable searches and seizures under Art. I, Sect. 12 of the New York State Constitution and the Fourth and Fourteenth Amendments to the United States Constitution.

509.     As a result of the foregoing actions of Defendants Lutz and Fabian, Mr. Goldstein suffered significant damages.

## COUNT VI

### Evidence Fabrication—42 U.S.C. § 1983
### (Defendants Newman, Goun, and Lutz)

510.     Mr. Goldstein repeats each allegation above as if set forth herein.

511.     By way of the foregoing, Defendants Newman, Goun and Lutz knowingly fabricated false information and evidence and forwarded that information and evidence to prosecutors at the Manhattan District Attorneys' Office and the Bronx District Attorneys' office.

512.     At all relevant times, Defendants Newman, Goun and Lutz were acting as investigating officials.

513.     That fabricated evidence was likely to influence a jury's verdict.

514.     The foregoing conduct of Defendants Newman, Goun and Lutz consisted of actions they took under color of state law, including but not limited to conduct undertaken in connection with state officials and with significant state aid.

56

515.    At all relevant times, Defendants Newman and Goun were not acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or in the clear absence of all jurisdiction.

516.    As a result of the foregoing actions of Defendants Newman, Goun, and Lutz, Mr. Goldstein was deprived of his rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the Constitution and suffered deprivations of liberty as a result.

### COUNT VII
**Conspiracy—42 U.S.C. § 1983**
**(Defendants Newman, Goun, Lutz, and Keating)**

517.    Mr. Goldstein repeats each allegation above as if set forth herein.

518.    Defendants Newman, Goun, Lutz, and Keating agreed to enter into a corrupt scheme to use their official positions to cause Mr. Goldstein to be falsely arrested and maliciously prosecuted for crimes they knew he did not commit, all exclusively for Defendant Goun's private benefit.

519.    These Defendants engaged in multiple overt acts in furtherance of their corrupt agreement.

520.    Defendants Newman, Lutz, and Goun agreed to act in concert to fabricate evidence and information that would be forwarded to the prosecution and was likely to influence a jury.

521.    Defendants Newman, Lutz, and Goun engaged in multiple overt acts in furtherance of their effort to fabricate evidence and information.

522.    The foregoing conduct of Defendants Newman, Goun, Lutz, and Keating were actions they each took under color of state law, including but not limited to conduct undertaken in connection with state officials and with significant state aid.

523.    At all relevant times, neither Defendants Newman, Goun, nor Keating were acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or

in the clear absence of all jurisdiction.

524.     As a result of the foregoing actions of Defendants Newman, Goun, Lutz, and Keating, Mr. Goldstein suffered significant damages.

## COUNT VIII

### Conspiracy—New York Law
### (Defendants Newman, Goun, Lutz, and Keating)

525.     Mr. Goldstein repeats each allegation above as if set forth herein.

526.     Defendants Newman and Goun agreed to act in concert to inflict tortious injury on Mr. Goldstein, *e.g.*, to have him falsely arrested and maliciously prosecuted by way of the Felony Complaint and the Superseding Misdemeanor Information.

527.     Both Defendants Newman and Goun engaged in multiple overt acts in furtherance of their effort to have Mr. Goldstein falsely arrested and maliciously prosecuted.

528.     Defendants Newman, Lutz, and Goun agreed to act in concert to fabricate evidence and information that would be forwarded to the prosecution and were likely to influence a jury.

529.     Defendants Newman, Lutz, and Goun engaged in multiple overt acts in furtherance of their effort to fabricate evidence and information.

530.     Defendants Goun, Keating, and Newman agreed to act in concert to inflict tortious injury on Mr. Goldstein, *e.g.*, to have him maliciously prosecuted by way of the Superseding Misdemeanor Information.

531.     Defendants Goun, Keating, and Newman engaged in overt acts in furtherance of their effort to have Mr. Goldstein maliciously prosecuted by way of the Superseding Misdemeanor Information.

532.     At all relevant times, neither Defendants Newman, Goun, nor Keating were acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or

in the clear absence of all jurisdiction.

533.    As a result of the foregoing actions of Defendants Newman, Goun, and Keating, Mr. Goldstein suffered significant damages.

### COUNT IX

**Aiding-and-Abetting**
**(Defendants Newman, Keating, and Lutz)**

534.    Mr. Goldstein repeats each allegation above as if set forth herein.

535.    Defendant Goun committed several underlying torts and wrongful acts, including abuse of process, false arrest, malicious prosecution, fabrication of evidence and information, official misconduct, deceit, and intentional infliction of emotional distress.

536.    Defendant Newman had actual knowledge of the foregoing underlying torts and wrongful acts committed by Defendant Goun.

537.    Defendant Keating had actual knowledge of certain of the foregoing underlying torts and wrongful acts committed by Defendants Newman and Goun.

538.    Defendant Newman provided substantial assistance to Defendant Goun in committing her underlying torts and wrongful acts.

539.    Defendant Newman's substantial assistance had a direct and reasonably foreseeable causal connection to the harms suffered by Mr. Goldstein by way of Defendant Goun's underlying torts and wrongful acts.

540.    Defendant Newman committed several underlying torts and wrongful acts, including abuse of process, false arrest, malicious prosecution, official misconduct, fabrication of evidence and information, and intentional infliction of emotional distress.

541.    Defendant Keating had actual knowledge of at least certain of Defendant Newman's and Defendant Goun's underlying torts and wrongful acts.

542.    Defendant Keating provided substantial assistance to Defendants Newman and Goun in committing those underlying torts and wrongful acts, including by preparing and filing the Superseding Misdemeanor Information.

543.    Defendant Lutz had actual knowledge of at least certain of Defendant Newman's and Defendant Goun's underlying torts and wrongful acts.

544.    Defendant Lutz provided substantial assistance to Defendants Newman and Goun in committing those underlying torts and wrongful acts, including by assisting Defendant Goun's fabrication of information and evidence and by signing the Felony Complaint.

545.    At all relevant times, neither Defendants Newman nor Keating were acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or in the clear absence of all jurisdiction.

546.    As a result of the foregoing actions of Defendants Newman, Keating, and Lutz, Mr. Goldstein suffered significant damages.

## COUNT X

### Infringement of the Right to Familial Association—42 U.S.C. § 1983
### (Defendants Newman, Goun, and Lutz)

547.    Mr. Goldstein repeats each allegation above as if set forth herein.

548.    By way of the foregoing, Defendants Newman, Goun, and Lutz intentionally interfered with Mr. Goldstein's constitutionally-protected relationship with his children.

549.    The foregoing conduct of Defendants Newman, Goun, and Lutz was so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.

550.    The foregoing conduct of Defendants Newman, Goun, and Lutz consisted of actions they each took under color of state law, including but not limited to conduct undertaken in connection

with state officials and with significant state aid.

551.    The foregoing conduct of Defendants Newman, Goun, and Lutz was specifically intended to interfere with Mr. Goldstein's relationship with his children.

552.    At all relevant times, Defendants Newman and Goun were not acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or in the clear absence of all jurisdiction.

553.    As a result of the foregoing actions of Defendants Newman, Goun, and Lutz, Mr. Goldstein was deprived of his rights pursuant to the First and Fourteenth Amendments to the Constitution.

## COUNT XI
### Conversion
### (Defendant Goun)

554.    Mr. Goldstein repeats each allegation above as if set forth herein.

555.    On October 5, 2022, Defendant Goun intentionally took, obtained, and withheld Mr. Goldstein's tangible personal property from Mr. Goldstein, its owner, which was located in the Brooklyn Apartment.

556.    Defendant Goun took Mr. Goldstein's property without authorization.

557.    Defendant Goun exercised dominion over that property.

558.    Mr. Goldstein demanded that Defendant Goun return the property.

559.    Defendant Goun refused to do so.

560.    The foregoing conduct of Defendant Goun directly caused Mr. Goldstein injuries.

## COUNT XII
### Replevin
### (Defendant Goun)

561.    Mr. Goldstein repeats each allegation above as if set forth herein.

562.     On October 5, 2022, Defendant Goun took personal property belonging to Mr. Goldstein from the Brooklyn Apartment.

563.     Defendant Goun is in possession of that property.

564.     Defendant Goun has been asked to return that property.

565.     Defendant Goun has refused to return that property.

## COUNT XIII

### Trespass to Chattel
### (Defendant Goun)

566.     Mr. Goldstein repeats each allegation above as if set forth herein.

567.     On October 5, 2022 and thereafter, Defendant Goun physically interfered with chattel owned by Mr. Goldstein that was located in the Brooklyn Apartment.

568.     It was Defendant Goun's intention to interfere with Mr. Goldstein's chattel.

569.     Defendant Goun knew that the chattel that she dispossessed was Mr. Goldstein's property.

570.     Defendant Goun dispossessed Mr. Goldstein of this chattel for a substantial period of time.

571.     The foregoing conduct of Defendant Goun directly caused Mr. Goldstein injuries.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Goldstein prays for relief and demands judgment in his favor on each of his claims against Defendants as follows:

(a)     Declaring and adjudging that Defendants' acts alleged herein violated Mr. Goldstein's rights under the laws of the United States, the State of New York, and/or the City of New York;

(b)     Entering judgment in favor of Mr. Goldstein and order that Mr. Goldstein shall recover (i) compensatory damages against each of the Defendants, jointly and severally, to compensate Mr. Goldstein for his past, present, and future pain, suffering, and other hardships arising from the Defendants' conduct; (ii) treble damages from Defendants Newman and Goun pursuant to New York Judiciary Law § 478; (iii) return of property wrongfully detained by Defendant Goun; and (iv) punitive damages against each of the Defendants pursuant to 42 U.S.C. § 1983, New York City Administrative Code § 8-803, and/or common law;

(c)     Entering injunctive relief sufficient to deter unconstitutional conduct by Defendants;

(d)     Awarding Mr. Goldstein the costs of the suit herein, including but not limited to attorney's fees pursuant to 42 U.S.C. § 1988, New York City Administrative Code § 8-803, and/or common law; and

(e)     Granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         August 6, 2025

By:    _____
       Benjamin D. White

       _____
       Michael L. Bloch

       BLOCH & WHITE LLP
       Michael L. Bloch, Esq.
       Benjamin D. White, Esq.
       Catherine G. Willett, Esq.
       152 West 57th Street, 8th Floor
       New York, New York 10019
       (212) 901-3820
       mbloch@blochwhite.com
       bwhite@blochwhite.com
       cwillett@blochwhite.com

       THE LAW OFFICES OF JOEL B. RUDIN, P.C.
       Joel B. Rudin, Esq.
       152 West 57th Street, 8th Floor
       New York, New York 10019
       (212) 752-7600
       jbrudin@rudinlaw.com

       *Attorneys for Plaintiff Joseph Goldstein*